# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                      |   |                 |
|--------------------------------------|---|-----------------|
| ROBERT D. GARVIN,                    | : | CIVIL ACTION    |
|     Plaintiff,   | : |                 |
|                                      | : |                 |
| v.                                   | : | No. 5:08-cv-3758 |
|                                      | : |                 |
| PROGRESSIVE CASUALTY INSURANCE CO.,  | : |                 |
|     Defendant.   | : |                 |

## MEMORANDUM OPINION

Goldberg, J.                                                                                                                May 10, 2010

      This case arises from Plaintiff, Robert D. Garvin's, allegations that Defendant, Progressive Casualty Insurance Company, discharged him from his employment in violation of the Americans with Disabilities Act (hereinafter "ADA"), and the Pennsylvania Human Rights Act (hereinafter "PHRA"). 42 U.S.C. § 12101, et seq.; 43 PA. CONS. STAT. ANN. § 951, et seq. (respectively). Plaintiff also raises retaliatory claims under the ADA and the Family Medical Leave Act (hereinafter "FMLA").[1] 29 U.S.C § 2601, et seq.

      Presently before the Court is Defendant's motion for summary judgment which seeks dismissal of the disability discrimination claim based upon Plaintiff's failure to establish a prima facie case of discrimination. Defendant also seeks dismissal of the retaliation claims asserting that there is no causal connection between Plaintiff's protected activities and his firing. For the reasons that follow, we will grant Defendant's motion.

---

[1] Plaintiff's complaint also sets forth both federal and state claims of age discrimination, but his counsel conceded at oral argument that he could not establish a prima facie case of age discrimination. Accordingly, the Court will consider those claims withdrawn.

1

## I. BACKGROUND

Plaintiff began his employment at Progressive in March 1997, as an investigator in the special investigations unit (hereinafter "SIU"). Plaintiff's responsibilities included identifying and investigating suspected instances of fraud. Plaintiff became a manager in 1999, where he oversaw eight (8) SIU investigators, investigated major cases, prepared the fraud plan required by the Pennsylvania Department of Insurance, supervised other investigations, and conducted quality review. (Pl. Dep., pp. 44, 50, 53, 58, 63.)

The evidence of record reflects that Defendant was generally satisfied with Plaintiff's performance, however, Plaintiff did receive a lower performance review rating in 2004 for improper conduct during a training course. Around that time, warnings were also issued to Plaintiff regarding his written and oral communication skills. (Pl. Dep., pp. 94, 96-97, 206, 283; Lloyd Dep., pp. 13, 16, 88.)

On August 10, 2005, Plaintiff had a laparoscopic cholecystectomy to remove his infected gall bladder. Due to complications from that surgery, Plaintiff took FMLA leave from August 10, 2005, to October 24, 2005, and returned to work without any medical restrictions. He testified that he "did everything afterward that I did before." However, because of his "constant diarrhea," which, according to Plaintiff, was the result of the surgery, and the need to have bathroom facilities readily available, Plaintiff requested a temporary reprieve from travel. This request was approved by Plaintiff's supervisor, Kurt Lloyd, without the necessity of medical documentation. Plaintiff stated that while he needed to avoid stress, he was able to fully perform his job. Plaintiff also testified about ongoing memory problems, but claimed that it never affected his work performance or that he needed a work accommodation. Aside from the gall bladder surgery, Plaintiff has not produced any

medical documentation supporting the above ailments. (Pl. Dep., pp. 141-44, 161, 165-68, 193-95, 225-27, 470, 567, 570, 585-87; Lloyd Dep., pp. 38, 91.)

Plaintiff claims that when he returned to work several comments were made about his health. According to Plaintiff, Lloyd expressed concern about his ability "to perform [his] job the way [he] did before," "with all the stress and everything." Pete Davis, then Defendant's Pennsylvania State Claims Manager (but not one of Plaintiff's direct managers), had lunch with Plaintiff to explain his concerns regarding Plaintiff's management of subordinates. According to Plaintiff, Davis stated that "there's more anger noticeable following [Plaintiff's] return from disability leave," and that Plaintiff was still having difficulties with his communication skills. Defendant, however, did not consider these problems to be major performance issues. (Pl. Dep., pp. 208-10, 227-28, 253, 260-62, 312-13; Davis Dep., pp. 17-18, 21-22, 28-29, 31-32; Lloyd Dep., pp. 53-55; Butler Dep., p. 27.)

Plaintiff received a performance ranking of "meets expectations," on both his 2005 and 2006 performance reviews. His 2006 review noted that he had worked on his communication issues and was improving. These reviews were consistent with all of Plaintiff's reviews dating back to 2002, in that his performance was rated as "meets expectations" or "meets expectations at a high level." (Pl. Dep., pp. 206-07, 403; Butler Dec., ¶¶ 6-7.)

In March 2006, New Jersey was added to Plaintiff's responsibilities as SIU manager, and he was increased from a manager level 2 to a manager level 3. In June 2006, Plaintiff alleges that Jim Rogers, Defendant's Pennsylvania State Manager, indicated that he was aware that Plaintiff had been sick and was concerned about his ability to keep up with the company's new referral process. (Pl. Dep., pp. 93, 304, 312-13, 332, 388.)

Plaintiff alleges that shortly therafter, he informed Steven Garfunkel, Progressive's Associate General Counsel, that managers were making comments about his health. Garfunkel did not recall such a conversation. Importantly, however, Plaintiff acknowledges that there were no more comments made to him about his health after the alleged conversation with Garfunkel. (Pl. Dep., pp. 368-69, 373, 399, 403; Garfunkel Dep., p. 9.)

A year later, on May 22, 2007, Plaintiff, accompanied by his girlfriend Cathy, traveled to Pittsburgh, Pennsylvania, for business. Plaintiff intended to meet with several police officers regarding a "sting vehicle," investigate the activities of one (1) of his subordinates, Don Girasia, and search for a vendor for the fire/theft team. Plaintiff conducted a ride-along with Girasia during which he checked Girasia's mileage log. There he told Girasia that he was having dinner that evening with Detective Christenson of the Penn Hills Police Department. (Pl. Dep., pp. 436-38, 458, 573; Girasia Dep., pp. 23-29, 32-33.)

The same day, Plaintiff and his girlfriend had dinner at the Grand Concourse in Pittsburgh. Plaintiff paid for the dinner in the amount of $79.82, and subsequently submitted an expense report identifying his dinner companions as Christenson and Sergeant Wetmore, of the Allegheny County Police. Defendant reimbursed Plaintiff for the full amount of the dinner. It is undisputed that neither Christenson nor Wetmore attended the dinner. (Pl. Dep., pp. 458-60, 462-63, 465-67, 511-12, 515; Erich Dep., p. 48; Wetmore Dec., ¶ 3; Christensen Dec., ¶ 3.)

In June 2007, Plaintiff's inaccurate expense report was brought to the attention of Joel Erich, one of Defendant's internal investigators. Erich contacted his supervisor and they decided to conduct an internal investigation. During the investigation, Erich obtained a copy of the dinner receipt from the restaurant. Erich also notified Timothy Butler in human resources and interviewed Girasia and

4

Plaintiff. During this interview, Plaintiff gave varying accounts of who attended the dinner in Pittsburgh, but finally admitted that neither Christenson nor Wetmore were in attendance. Erich then contacted Wetmore and Christenson, but only reached Wetmore, who confirmed that he had not attended dinner with Plaintiff.[2] Based on this investigation, Erich concluded that Plaintiff had violated company policy by "submitting false or misleading information deliberately, knowingly creating false or misleading entries in the company's books or records, including electronic systems." This conclusion was presented to human resources and Lloyd, Plaintiff's manager. (Pl. Dep., pp. 461-66, 468, 471-72, 474, 476-77, 479-80, 508-17, 519, 521-22, 525-26, 529; Erich Dep., pp. 10, 16-17, 28-31, 33-34, 41, 43-46, 48, 52-56, 67-74; Christenson Dec., ¶¶ 3-4.)

On July 6, 2007, Lloyd decided to terminate Plaintiff for knowingly filing a false expense report in violation of company policy. Although he did consult with human resources, Lloyd was the sole individual who made the termination decision.[3] (Lloyd Dep., pp. 83, 86-87.)

## II. LEGAL ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." There is a dispute over a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson

---

[2] After Plaintiff was terminated, Christenson also confirmed to Defendant that he had not had dinner with Plaintiff.

[3] Erich testified that he had conducted multiple investigations on false expense reports, five (5) of which were for amounts less than $79.00. In all the cases where Defendant concluded that the expense reports were false, the employees were terminated. (Erich Dep., pp. 14-15, 80-81.)

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" only if it might affect the outcome of the case under governing law. Id.

The court must consider the evidence and all reasonable inferences drawn therefrom in favor of the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). Disagreements over what inferences may be drawn from the facts, preclude summary judgment. Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996). If there is a conflict in evidence presented by both parties, the court must accept the allegations of the nonmoving party as true. Anderson, 477 U.S. at 255.

The moving party bears the burden of showing an absence of factual issues where the nonmoving party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then establish evidence sufficient to prove each element of his case. J.F. Feeser, Inc. v. Serv-a-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) (citing Celotex, 477 U.S. at 323).

### B. Disability Discrimination Claim

Plaintiff claims that he is disabled within the meaning of the ADA because he has a disability in the major life activity of eliminating waste. Plaintiff posits that he was terminated because of this disability as evidenced by the comments about his health made by Defendant's employees. (Pl. Memo., pp. 7-16.) Defendant counters that Plaintiff was not disabled, was never regarded as disabled, and was terminated for falsifying an expense report, which was completely unrelated to his alleged disability. (Def. Memo, pp. 6-20.)

1. **The Americans with Disabilities Act**

The Third Circuit considers ADA and PHRA claims simultaneously. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). Therefore, we will focus on the ADA and apply that same analysis and conclusions to Plaintiff's PHRA claims.[4]

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In order to make out a prima facie case of disability discrimination under the ADA, the plaintiff must establish that he: 1) has a disability or is regarded as having a disability; 2) is otherwise qualified to perform the essential functions of the job; and 3) has suffered an adverse employment action because of that disability. Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006); Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001). Because the parties agree that Plaintiff was a qualified individual within the meaning of the ADA, we will address only the first and third elements. (Def. Memo., pp. 6-20; Pl. Memo., p. 5.)

---

[4] We note that Congress recently amended the ADA by enacting the ADA Amendments Act of 2008 (hereinafter "ADAAA"), Pub. L. No. 110-35, 122 Stat. 3553 (2008). The ADAAA became effective on January 1, 2009, and broadened the definition of disability. The ADAAA should not, however, be retroactively applied to conduct prior to January 1, 2009, "if it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994). Accordingly, Judges in this District have refused to apply the ADAAA retroactively. See Namako v. Acme Markets, Inc., No. 08-3255, 2010 WL 891144 (E.D.Pa. Mar. 11, 2010); Seibert v. Lutron Elecs., No. 08-5139, 2009 WL 4281474 (E.D.Pa. Nov. 30, 2009). Here, the conduct in question occurred between 2005 and 2007, rendering the ADAAA inapplicable. Thus, we will apply the ADA as enacted and interpreted before January 1, 2009.

## 2. **Plaintiff's Alleged Disability**

In order to meet the first prong of this test, the plaintiff must show that he has a physical or mental impairment that substantially limits one (1) of life's major activities or that he is regarded as having such an impairment. Maresca v. Blue Ridge Commc'ns, No. 09-2470, 2010 WL 407127, at * 2 (3d Cir. Feb. 5, 2010). Any activity of central importance to life, such as caring for oneself, walking, seeing, hearing, speaking, breathing, learning and working, is a major life activity. 29 C.F.R. § 1630.2(i). An impairment is substantially limiting if the plaintiff is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005) (citing C.F.R. § 1630.2(j)(1)). Courts consider the nature and severity of the impairment, the duration of the impairment, the long term impact of the impairment, and any available mitigating measures such as medication and treatment, in determining whether the plaintiff is substantially limited. Id.

The Third Circuit has held that digestion is a major life activity. Doe v. County of Centre, PA, 242 F.3d 437, 447 (3d Cir. 2001). More specifically, eliminating waste from the body is a major life activity, because in its absence, death results. Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 384 (3d Cir. 2004) (elimination of waste from the blood was a major life activity) (citing Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999) (controlling one's bowels was found to be a major life activity)). Several district courts have also found that medical conditions such as Crohn's disease, which often results in difficulty controlling one's bowels and eliminating waste, do present

a triable issue of material fact as to whether the plaintiff has a substantial impairment in a major life activity. See, e.g., U.S. Equal Employment Opportunity Comm'n v. Sfaila, LLC, 66 F.Supp.2d 637 (E.D.La. 2009); Joffer v. Premier Bankcard Inc., No. 06-4265, 2008 WL 2371149 (D.S.D. June 6, 2008); Duncan v. Quality Steel Prods., Inc., No. 06-11590, 2007 WL 2156289 (E.D.Mich. July 25, 2007); Banks v. CBOCS West, Inc., No. 01-795, 2005 WL 1126913 (N.D.Ill. May 9, 2005).

Here, Plaintiff has alleged that complications from gall bladder surgery caused him to have "constant diarrhea," and created the need for bathroom facilities to be readily available to change his clothes several times a day. Plaintiff claims that these complications were ongoing and severe for two (2) years following his surgery. While Plaintiff acknowledges that gall bladder surgery is not akin to Crohn's disease, he asserts that the surgery has impacted a major life activity - eliminating waste. (Pl. Dep., p. 166.)

Plaintiff argues that the facts highlighted above demonstrate that his problems with eliminating waste were substantial. Defendant opposes such a view and points to Plaintiff's lack of medical documentation supporting his claimed disability and Plaintiff's own testimony that aside from a brief break from work related travel, he was able to perform his job just as he did before the surgery. (Def. Memo., pp. 7-9.) Given this dispute and our obligation to view all facts in a light most favorable to Plaintiff, we find that there is a factual question as to whether or not Plaintiff's limitation on the major life activity of waste elimination is substantial.

### 3. Was Plaintiff's Termination Due To His Alleged Disability?

In order to establish a prima facie case of disability discrimination and survive summary judgment, Plaintiff must also point to facts establishing that he was terminated as a result of his disability. As previously noted, Plaintiff claims that, due to certain remarks allegedly made

regarding his health, a sufficient factual issues exist on this issue. Defendant does not directly address this element. Rather, Defendant asserts that Plaintiff cannot point to evidence that reflects that the termination was pretextual. While we have addressed the pretextual issue below, and agree with Defendant that summary judgment should be granted on this basis, we will first analyze whether Plaintiff has fulfilled the third element of a prima facie discrimination case by identifying evidence establishing that his termination was discriminatory. (Def. Memo., pp. 11-20.)

The facts of record reflect that Defendant's investigation confirmed that Plaintiff had falsified his expense report. Importantly, we note that Plaintiff admitted that he did not have dinner with two (2) police officers. Rather, Plaintiff acknowledged that he ate with his girlfriend Cathy and submitted expenses for their meal under the guise of dinner with the officers. Plaintiff's termination was also undertaken in accordance with company policy, and Defendant's internal investigator testified that he was aware of at least five (5) other instances where employees were terminated for filing false expense reports, some for lesser amounts than Plaintiff's. These facts are mostly uncontested. (Pl. Dep., pp. 458-68, 471-72, 474, 476-77, 479-80, 508-17, 519, 521-22, 525-26, 529; Erich Dep., pp. 10, 16-17, 28-31, 33-34, 41, 43-46, 48, 52-56, 67-74; Wetmore Dec., ¶ 3; Christensen Dec., ¶ 3.)

While Defendant acknowledges that some comments regarding Plaintiff's health were made upon his return from work, it is undisputed that the persons making those comments were non-decision makers in terms of Plaintiff's termination. Indeed, Plaintiff has admitted that those comments ceased in early 2006, over a year before his termination. (Pl. Dep., p. 399.) Precedent on this issue clearly holds that, "Stray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made

temporally remote from the date of the decision." Brewer v. Quaker State Oil Refinery Corp., 72 F.3d 326, 333 (3d Cir. 1995).

Given the lack of evidence presented by Plaintiff regarding the potential influence of his alleged disability on his termination, and in light of the fact that it is uncontested that Plaintiff falsified an expense report, we find that Plaintiff has not established a prima facie case of disability discrimination under the ADA or PHRA.

### 4. Pretext

Even if Plaintiff could make out a prima facie case of disability discrimination, he would still have to establish that Defendant's legitimate, non-discriminatory reason for termination was pretextual. The Third Circuit has adopted the McDonnell Douglas burden shifting framework[5] and applied it to disability discrimination claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Parker v. Verizon Pa., Inc., 309 Fed.Appx. 551, 555 (3d Cir. 2009). Thus, once the plaintiff has made out a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. The burden then shifts back to the plaintiff to adduce sufficient evidence to establish that the employer's legitimate reason was a pretext for the employment discrimination. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Sufficient evidence of pretext is evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than

---

[5] This burden-shifting analysis was first applied to employment discrimination claims under Title VII to the Civil Rights Act of 1964. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

not a motivating or determinative cause of the adverse employment action." Id. In short, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employee's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence.'" Id. at 765 (citing Ezold v.Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

Here, the factual pretext analysis is similar to our previous conclusions regarding the lack of evidence provided by Plaintiff that his firing was discriminatory. Defendant asserts that Plaintiff was terminated for submitting a false expense report in which he sought reimbursement for a dinner with his girlfriend under the auspices of dining with two (2) police officers. This is a legitimate, non-discriminatory reason for termination, and thus, the burden shifts to Plaintiff to prove that this reason is pretextual.

Plaintiff raises only two (2) arguments as it relates to pretext on the disability discrimination. He first argues that Lloyd, his manager, failed to review all of the documentation surrounding the internal investigation prior to terminating Plaintiff. (Pl. Memo., pp. 23-24.) This argument fails because it is well-established that a court will not second-guess a company's business judgment or decisional process. Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005); Chubirka v. Int'l Paper/Xpedx Paper and Graphics, No. 04-5010, 2005 WL 1840170, at *5 (E.D.Pa. Aug. 2, 2005). The only inquiry is whether the decisionmaker, Lloyd, at the time of his decision, honestly believed that Plaintiff had violated the company's policy at issue. See, e.g., Stahlnecker, No. 08-681, 2009 WL 661927, at *6 (E.D.Pa. Mar. 11, 2009). Here, the record establishes that Lloyd had reviewed information relevant to the investigation on the falsified expense report and that he based his decision on that information. (Lloyd Dep., pp. 83, 86-87.)

Plaintiff also asserts that he did not intentionally falsify the expense report, but claims it was a mistake. (Pl. Memo., p. 23.) This argument also fails because Plaintiff's state of mind is irrelevant - it is the state of mind of the decisionmaker that matters in terms of pretext. Stahlnecker, 2009 WL 661927, at *5. Furthermore, even if Plaintiff did make an honest mistake, somehow confusing his girlfriend with police officers, an employer can make a "bad" decision to terminate an employee as long as the "bad" decision is not based on a disability. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997); Milham v. Cortiva Educ., Inc., No. 06-4226, 2007 WL 314669, at *6 (E.D.Pa. Oct. 25, 2007). Therefore, we also conclude that Plaintiff has adduced no evidence upon which a reasonable jury could find that such a legitimate, non-discriminatory reason for termination was fabricated or so weak, implausible, inconsistent or incoherent that it is unworthy of credence.

### C. Retaliation Claims

#### 1. Prima Facie Case Under the ADA and FMLA

Plaintiff also asserts that Defendant retaliated against him by giving him a substandard performance review, dismissing his complaints, and terminating his employment, all in violation of the ADA and FMLA. In order to establish a prima facie case of ADA retaliation, the plaintiff must prove that: 1) he engaged in a protected employee activity; 2) he suffered an adverse employment action after or contemporaneously with the protected activity; and 3) there is a causal connection between his protected activity and the employer's adverse action. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). The employee's protected conduct must relate to conduct made unlawful by the ADA. Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995). The elements required to establish a prima facie case under the FMLA are the same as those for the ADA, with the

exception that the protected employee conduct must relate to conduct made unlawful under the FMLA. Bearley v. Friendly Ice Cream Corp., 322 F.Supp.2d 563, 572-73 (M.D.Pa. 2004).

Here, Defendant concedes that Plaintiff engaged in a protected activity under the ADA when he allegedly complained in June 2006, to Garfunkel, about comments being made about his health. Similarly, Defendant agrees that Plaintiff engaged in a protected activity under the FMLA when he took leave from August 2005 to October 2005. Defendant also concedes that Plaintiff was terminated, albeit after a period of at least a year, after he engaged in those protected activities. (Def. Memo., pp. 21, 23.) Therefore, the only issue is whether or not there is a causal connection between Plaintiff's protected activities and his termination.

### 2. Causal Connection

A causal connection can be established by showing a temporal proximity or a pattern of antagonism in response to the protected activity. Walsh v. Wal-Mart Stores, Inc., 200 Fed.Appx. 134, 136-37 (3d Cir. 2006) (causal connection in ADA retaliation); Coppa v. Am. Soc'y for Testing Materials, No. 04-234, 2005 WL 1124180, at *2 (E.D.Pa. May 11, 2005) (causal connection in FMLA retaliation). Courts have consistently held that periods as short as a a few months are too long to establish a temporal proximity. Walsh, 200 Fed.Appx. at 136 (eight (8) months too long for temporal proximity); Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (nineteen (19) months too long for temporal proximity); King v. School Dist. of Philadelphia, No. 00-2503, 2001 WL 856948, at *4-5 (E.D.Pa. July 26, 2001) (ten (10) months too long for temporal proximity).

In the case before us, Defendant allegedly complained about comments regarding his health in June 2006, and he was terminated thirteen (13) months later in July 2007. Defendant took FMLA as late as October 2005, but was not terminated until twenty-one (21) months later. Therefore, there

is no temporal proximity between either of Defendant's protected activities and his termination.[6]

Plaintiff's argument as to a pattern of antagonism fails as well. Plaintiff admits that the last comments about his health were made no later than June 2006, over a year before his termination, and consequently, there is no pattern of ongoing antagonism beyond when Plaintiff allegedly engaged in the protected activity of complaining about those comments. (Pl. Dep., p. 399.) Plaintiff has also attempted to point to a downturn in his performance review after he engaged in the protected activities. The record, however, reveals quite the contrary in that Plaintiff received the same level of performance review he had received at least once before the protected activities, and that positive comments were made about his improved communication skills. (Pl. Dep., pp. 206-07, 403; Butler Dec., ¶¶ 6-7.) See Kramer v. Exxon Mobil Corp., No. 07-436, 2009 WL 1544690, at *5 (D.N.J. June 3, 2009) (no causal connection when performance reviews were not substantially changed after protected activity). Indeed, Plaintiff was actually given a promotion in March 2006, after the protected activity, which directly refutes any notion of antagonism. (Pl. Dep., p. 93.) See Zippittelli v. J.C. Penny Co., Inc., No. 05-2214, 2007 WL 674588, at *11 (M.D.Pa. Feb. 28, 2007) (no causal connection when protected activity was followed by a promotion). Thus, there is no set of facts upon which a reasonable factfinder could possibly conclude that there was a pattern of antagonism against Plaintiff. Given the lack of causal connection between the protected activities and Plaintiff's termination, Plaintiff has not established a prima facie case of retaliation under either the ADA or

---

[6] Plaintiff alleges that he complained about Defendant's business practices related to vendor qualification, telephone recordings and approved repair shops from March 2007 to June 2007. (Def. Memo., pp. 21-22.) Because none of those issues relate to protected activities under the ADA or FMLA, they are irrelevant for the purposes of a temporal proximity inquiry. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001); Zappan v. Pa. Bd. of Probation and Parole, 152 Fed.Appx. 211, 218 (3d Cir. 2005); Barber, 68 F.3d at 701-02.

FMLA.

Even if Plaintiff could establish a prima facie case of retaliation under either statute, Plaintiff would have to demonstrate that Defendant's legitimate, non-discriminatory reason for termination - falsifying an expense report, was pretextual. For the reasons set forth supra, Plaintiff cannot establish pretext.

## III. CONCLUSION

For the foregoing reasons, this Court concludes that Plaintiff has not established a prima facie case for disability discrimination under the ADA or PHRA or a prima facie case for retaliation under the ADA or FMLA. Our Order follows.